CLINE ET AL., APPELLANTS, *v.*
AMERICAN AGGREGATES CORPORATION, APPELLEE.

[Cite as Cline *v.* American Aggregates Corp. (1984), 15 Ohio St. 3d 384.]

(No. 83-1910—Decided December 31, 1984.)

Mr. Steve J. Edwards, Messrs. Hastie & Moore and Mr. Michael Garth Moore, for appellants.

Messrs. Lucas, Prendergast, Albright, Gibson & Newman, Mr. Robert E. Albright and Mr. Richard C. Brahm, for appellee.

Mr. Joseph X. DiNovo, urging reversal for amicus curiae, National Water Well Assn.

Ms. Christine N. Carlson, urging reversal for amicus curiae, Ohio Environmental Council.

J. P. CELEBREZZE, J. This court is today asked to reexamine the common law of Ohio as it is applied to ground water. The current standard recognizes no correlative rights with respect to ground water between adjoining landowners. This court last examined the issues encompassed in the present case in Frazier v. Brown (1861), 12 Ohio St. 294. In Frazier the "English rule" was applied to resolve any conflict involving percolating ground water.

This court stated in Frazier:

"* * * '[T]here are no correlative rights existing between the proprietors of adjoining lands, in reference to the use of the water in the earth, or percolating under its surface. Such water is to be regarded as part of the land itself, to be enjoyed absolutely by the proprietor within whose territory it is; and to it the law governing the use of running streams is inapplicable.' " Id. at 308.

In support of the application of this absolute ownership doctrine the Frazier opinion further explained:

"* * * In the absence of express contract, and of positive authorized legislation, as between proprietors of adjoining lands, the law recognizes no correlative rights in respect to underground waters percolating, oozing

or filtrating through the earth; and this mainly from considerations from public policy. 1. Because the existence, origin, movement and course of such waters, and the causes which govern and direct their movements, are so secret, occult and concealed, that an attempt to administer any set of legal rules in respect to them would be involved in hopeless uncertainty, and would be, therefore, practically impossible. 2. Because any such recognition of correlative rights, would interfere, to the material detriment of the common wealth, with drainage and agriculture, mining, the construction of highways and roadways, with sanitary regulations, building and the general progress of improvement in works of embellishment and utility." *Id.* at 311.

Adherence to the English rule or absolute ownership doctrine has been the subject of criticism since its inception. Critics have remarked that the rule fails to acknowledge advances in the understanding of subsurface waters since the 1800s. The "mysterious and occult" description of ground water flows does not describe or recognize the present state of scientific advancement.

One justification for the absolute ownership doctrine was predicated on the alleged protection it afforded to the property rights of landowners whose activities resulted in ground water diversion. Jurisdictions have, however, recognized the uncertainty and harshness associated with adherence to the doctrine. In *Meeker* v. *East Orange* (1909), 77 N.J. Law 623, 74 A. 379, the New Jersey Supreme Court explained at 637-638 that:

"It is sometimes said that unless the English rule be adopted, landowners will be hampered in the development of their property because of the uncertainty that would thus be thrown about their rights. It seems to us that this reasoning is wholly faulty. If the English rule is to obtain, a man may discover upon his own land springs of great value for medicinal purpose or for use in special forms of manufacture, and may invest large sums of money upon their development; yet he is subject at any time to have the normal supply of such springs wholly cut off by a neighboring landowner, who may, with impunity, sink deeper wells and employ more powerful machinery, and thus wholly drain the sub-surface water from the land of the first discoverer."

Other American decisions have recognized that the advancement of scientific knowledge can insure the protection of a landowner's property rights in ground water to the same degree that the riparian doctrine protects the interests of landowners adjacent to a stream.

See *Bassett* v. *Salisbury Mfg. Co.* (1862), 43 N.H. 569, 82 Amer. Dec. 179; *Nashville, C. & St. L. Ry. Co.* v. *Rickert* (1935), 19 Tenn. App. 446, 89 S.W. 2d 889; *Erickson* v. *Crookston Waterworks, Power & Light Co.* (1907), 100 Minn. 481, 111 N.W. 391; *Horne* v. *Utah Oil Refining Co.* (1921), 59 Utah 279, 202 P. 815; *Tequesta* v. *Jupiter Inlet Corp.* (Fla. 1979), 371 So. 2d 663; *Friendswood Development Co.* v. *Smith-Southwest Industries, Inc.* (Tex. 1978), 576 S.W. 2d 21.

The injustice of the English rule was best summed up by the California Supreme Court in *Katz* v. *Walkinshaw* (1903), 141 Cal. 116, 74 P. 766, where the court stated at 128:

"Traced to its true foundation, the rule is simply this: that owing to the difficulties the courts will meet in securing persons from the infliction of great wrong and injustice by the diversion of percolating water, if any property right in such water is recognized, the task must be abandoned as impossible, and those who have valuable property acquired by and dependent on the use of such water must be left to their own resources to secure protection for their property from attacks of their more powerful neighbors, and failing in this, must suffer irretrievable loss; that might is the only protection.

" 'The good old rule

" 'Sufficeth them, the simple plan,

" 'That they should take who have the power,

" 'And they should keep who can.'

"The field is open for exploitation to every man who covets the possessions of another or the water which sustains and preserves them, and he is at liberty to take that water if he has the means to do so, and no law will prevent or interfere with him, or preserve his victim from attack. The difficulties to be encountered must be insurmountable to justify the adoption or continuance of a rule which brings about such consequences."

Appellants suggest, and this court is persuaded, that the better standard to apply to ground water issues is found in the Restatement of the Law 2d, Torts, Section 858. Section 858 applies a reasonable use doctrine to underground water, as set forth below:

"(1) A proprietor of land or his grantee who withdraws ground water from the land and uses it for a beneficial purpose is not subject to liability for interference with the use of water by another, unless

"(a) the withdrawal of ground water unreasonably causes harm to a proprietor of neighboring land through lowering the water table or reducing artesian pressure,

"(b) the withdrawal of ground water exceeds the proprietor's reasonable share of the annual supply or total store of ground water, or

"(c) the withdrawal of the ground water has a direct and substantial effect upon a watercourse or lake and unreasonably causes harm to a person entitled to the use of its water."

Finding this reasonable use doctrine to be much more equitable in the resolution of ground water conflicts, this court overrules *Frazier* v. *Brown, supra,* and all its progeny and adopts Section 858 of the Restatement of the Law 2d, Torts, as the common law of Ohio.

Therefore, the judgment of the court of appeals is reversed and the cause is remanded to the trial court for further proceedings.

*Judgment reversed*
*and cause remanded.*

CELEBREZZE, C.J., W. BROWN, SWEENEY, LOCHER and C. BROWN, JJ., concur.

HOLMES, J., concurs separately.

HOLMES, J., concurring.  While examining the law of percolating waters as a member of the Tenth Appellate District in *Huelsmann* v. *State* (1977), 56 Ohio App. 2d 100 [10 O.O.3d 126], I stated that the modern day needs of our growing industrialized state may dictate a change in the law to provide for a greater conservation of one of our greatest natural resources. *Id.* at 105. At that time, however, it was my view that the General Assembly should accept the challenge to reconstruct the law pertaining to water rights. Since our legislators have not acted, I agree with this court's adoption of Section 858 of the Restatement of the Law 2d, Torts.

Percolating waters have been defined as subsurface waters which, without any permanent, distinct or definite channel, percolate in small veins and filter from one owner's land to that of another. Callahan, Principles of Water Rights Law in Ohio (Ed. 1979) 27, Section 50, citing *Frazier* v. *Brown* (1861), 12 Ohio St. 294. The withdrawal of percolating water by a property owner may in some cases drastically diminish the water supply of an adjoining landowner. Until today, the traditional approach in Ohio was that the owner of the soil had absolute ownership in the percolating water beneath it. *Frazier, supra; Elster* v. *Springfield* (1892), 49 Ohio St. 82; *Logan Gas Co.* v. *Glasgo* (1930), 122 Ohio St. 126. This approach stemmed from the common-law principle set forth in the English case of *Acton* v. *Blundell* (Exch. 1843), 12 M. & W. 324, 152 Eng. Rep. 1223. See, also, Note, Establishing Liability for Damage Resulting From the Use of Underground Percolating Water: Smith-Southwest Industries v. Friendswood Development Company (1978), 15 Houston L. Rev. 454.

The Restatement standard preserves the general rule of nonliability, *i.e.,* the privilege to use the water beneath one's land, and it also recognizes the exception when there is usually enough water for all users but one landowner removes an excess to the detriment of others. It is that owner who should bear the costs necessitated by a lowering of the water table.

The adopted rule will justly meet the changing needs of the users of water. What is a reasonable use of the water can be redetermined as surrounding circumstances change. The flexibility of the rule will allow for the utilization of water where it is most necessary.

The Restatement theory also provides security that one's source of ground water cannot be usurped by a neighbor. A damaged proprietor will be able to recover costs necessitated by the lowering of the water table. The solution is for the person causing the harm to supply the needs of the person harmed, and placing liability on the person causing the harm will encourage this result.

In addition, the rule promotes economic efficiency and encourages the reasonable use of water. Industries which utilize large amounts of underground waters will not be liable unless their use is unreasonable and creates a burden to neighboring landowners. Rural owners are also protected from commercial users who drastically lower the water table. A court's task will be to make whole the damaged property owner.

Finally, a primary goal of water law should be that the legal system conforms to hydrologic fact. Scientific knowledge in the field of hydrology has advanced in the past decade to the point that water tables and sources are more readily discoverable. This knowledge can establish the cause and effect relationship of the tapping of underground water to the existing water level. Thus, liability can now be fairly adjudicated with these advances which were sorely lacking when this court decided *Frazier* more than a century ago.